## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

**Civil Action No. 1:17-cv-01755**

ROBERT KENNEY, individually and
on behalf of all others similarly situated,

        Plaintiff,

v.


HELIX TCS, INC.,

        Defendant

v.

HRBENEFIX CO, LLC

---

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION AND AUTHORIZATION TO SEND NOTICE TO PUTATIVE CLASS MEMBERS

---

Defendant Helix TCS, Inc. ("Helix" or "Defendant"), by and through its counsel, Allen Vellone Wolf Helfrich & Factor P.C., hereby submits this Response to Plaintiff's Motion for Conditional Certification and Authorization to Send Notice to Putative Class Members, and in support thereof, states as follows:

### INTRODUCTION

"I cannot accept the extraordinary assertion that an aggrieved party can file a complaint, claiming to represent a class whose preliminary scope is defined by him, and by that act alone obtain a court order which conditionally determines the parameters of the potential class and requires discovery concerning the members of that class." *Shushan v. Univ. of Colorado at Boulder*, 132 F.R.D. 263, 268 (D. Colo. 1990).

As the *Shushan* court explicitly held, Rule 23's certification process is appropriate in this Fair Labor Standards Act litigation, not Kenney's desired "two-stage certification process." This Court should, therefore, deny Plaintiff's Motion for Conditional Certification and Authorization to Send Notice to Putative Class Members (the "Certification Motion") and bifurcate discovery into a class certification stage and a merits stage. Any discovery during the certification stage should be limited to Rule 23 certification matters; an accepted standard in this Circuit.

In the event this Court eschews the well-accepted Rule 23 certification process, Plaintiff nevertheless fails to satisfy the standard necessary for conditional certification. As discussed below, the only "evidence" offered by Plaintiff in support of conditional certification are two declarations (despite having at least eight site supervisors opt-in to this action), and several unsupported and conclusory allegations. The weight of the actual evidence belies Kenney's argument that the purported class are similarly situated victims of a common policy or plan. This Court should deny conditional certification.

Finally, if this Court grants conditional certification, it should deny the proposed notice—as it is misleading and biased—and the proposed notice dissemination method, and order the parties confer and attempt to agree on a mutually acceptable notice.

## **ARGUMENT**

### A.     **This Court Should Apply Rule 23's Certification Procedures.**

Contrary to Plaintiff's assertion, this Circuit does not only "use a two-stage process for determining whether FLSA class members are similarly situated to the named plaintiff." [Dkt. 96 at p. 8]. In fact, it is well established that there are three certification standards for collective actions under 29 U.S.C.A. § 216(b) and each of the "approaches allow for consideration of the same or similar factors, and generally provide a district court with discretion to deny certification

for trial management reasons." *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001); *see also In re Chipotle Mexican Grill, Inc.*, No. 17-1028, 2017 WL 4054144 (10th Cir. Mar. 27, 2017) (district courts have discretion which certification approach it uses).

This Court should apply Federal Rule of Civil Procedure 23's requirements to class certification. Discovery should be bifurcated into a certification stage and a merits stage. Any discovery during the certification stage should be limited to Rule 23 certification matters and conditional certification should be predicated on this class-based discovery. After the class-based discovery, "Rule 23(a)'s four prerequisites [numerosity, commonality, typicality, and adequacy of representation] and 23(b)(3)'s requirement that common questions of fact predominate should be used to determine whether plaintiffs are similarly situated." *Bayles v. Am. Med. Response of Colorado, Inc.*, 950 F. Supp. 1053, 1061 (D. Colo. 1996).

While this Court has discretion in the certification approach it chooses, courts in this District have favored the Rule 23 certification approach. The leading case on using Rule 23 for certification of collective actions is *Shushan*, 132 F.R.D. 263, which held squarely that the Rule 23 factors are most appropriate to determine whether a plaintiff is "similarly situated" for purposes of § 216(b), notwithstanding that Rule 23 contains an opt-out provision and the FLSA contemplates an opt-in approach. In *Shushan*, the court reasoned that there was no apparent reason why "district courts should fail to utilize existing procedures, embodied in Rule 23, which are designed to promote effective management, prevent potential abuse, and protect the rights of all parties." *Id.* at 268. The court explained that "it does not seem sensible to reason that, because Congress has effectively directed courts to alter their usual course and not be guided by Rule 23's 'opt-out' feature in ADEA class actions [which are governed by §216(b)], it has also directed them to discard the compass of Rule 23 entirely and navigate the murky waters of such actions by the

stars or whatever other instruments they may fashion." *Id.* at 266. Thus, the court held, "[b]efore I conditionally determine the scope of the class, plaintiffs will need to satisfy me that there exists a definable, manageable class and that they are proper representatives of the class. They will, in other words, need to show that they satisfy the requirements of Rule 23 or convince me that a particular requirement is inconsistent with 29 U.S.C.A. § 216(b)." *Id.* at 268.

Other courts have held that plaintiffs must meet the requirements of a modern Rule 23 class action to proceed collectively under § 216(b). *See ex. St. Leger v. A.C. Nielsen Co.*, 123 F.R.D. 567 (N.D.Ill.1988) (stating that certification was inappropriate because common questions did not predominate). Indeed, nothing in the FLSA's legislative history supports Plaintiff's argument to apply the lenient "two-stage certification" standard in place of Rule 23's more stringent requirements. The opt-in requirements of FLSA §216(b) and the opt-out procedure in Rule 23 are insufficient to exempt §216(b) collective actions from Rule 23 in its entirety, including its rigorous certification requirements.

Rule 23 is designed to promote effective case management while also holding the court responsible for protecting the interests of the class members by invoking Rule 23 procedures. *See Shushan*, 132 F.R.D. at 267. The Tenth Circuit is amenable to applying a stringent certification standard to avoid excessive and needless litigation. *See Id.*; *see also Dolan v. Project Constr. Corp.*, 725 F.2d 1263, 1267 (10th Cir. 1984) (In examining revised collective/class action discovery practices and the burdens on employers from 216(b) collective actions, the Tenth Circuit noted that "[n]ot only did Congress disapprove of the normal discovery practices associated with class actions but it also made the specific finding that unless the provisions of the FLSA of 1938 were changed the courts and the country would be burdened with excessive and needless litigation") (internal quotations and citations omitted). To avoid unduly burdening Helix with

excessive and unnecessary litigation associated with Plaintiff's action, this Court should exercise its discretion and first order controlled class-based discovery, then apply Rule 23's certification standards to Plaintiff's class.

**B.      In the Alternative, This Class Should not be Conditionally Certified.**

This Court should deny conditional certification if it decides to use Plaintiff's desired certification method.  Collective actions under the FLSA are authorized by 29 U.S.C. § 216(b).  Section 216(b) provides for a collective action where the complaining employees are "similarly situated."  Where district courts permit conditional certification, the Tenth Circuit has required a two-step approach for determining whether plaintiffs are "similarly situated" for purposes of § 216(b).  *See Thiessen*, 267 F.3d at 1105.  Under this approach, a court first arrives at an initial "notice stage" assessment of whether plaintiffs are "similarly situated."  *See Id.* at 1102 (citing *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997)).  In other words, "the district court determines whether a collective action should be certified for purposes of sending notice of the action to potential class members."  *Williams v. Sprint/United Mgmt. Co.*, 222 F.R.D. 483, 484-85 (D. Kan. 2004).  Importantly, "[c]onditional certification in the notice stage . . . is by no means automatic."  *Eagle v. Freeport-McMoran, Inc.*, 2:15-CV-00577-MV-SMV, 2016 WL 7494278, at *2 (D.N.M. Aug. 3, 2016).

*i. Plaintiffs Have Not Met Their Burden of Establishing That the Purported Class Members Are "Similarly Situated" Victims of an Unlawful Common Policy or Plan.*

This Court has absolute discretion to deny notice-stage certification where the evidence fails to demonstrate that members of the putative class are "similarly situated."  The United States Supreme Court has made clear that a court's discretion to permit the sending of notice should be exercised "only in appropriate cases," where the plaintiff has met his or her burden.  *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *see also Camper v. Home Quality Mgmt.*

5

*Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000) ("The relevant inquiry then is not whether the court has discretion to facilitate notice, but whether this is an appropriate case in which to exercise that discretion."). In deciding whether to facilitate notice, the court has the "responsibility to avoid the stirring up litigation through unwarranted solicitation" in a collective action. *See Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 944 (W.D. Ark. 2003).

The initial collective action standard under the FLSA "requires plaintiff to provide more than [their] own speculative allegations, standing alone." *Stubbs v. McDonald's Corp.*, 227 F.R.D. 661, 666 (D. Kan. 2004) (denying conditional certification of FLSA collective action brought by restaurant worker for overtime pay, where named plaintiff failed to establish that proposed class members were "similarly situated;" plaintiff provided little evidence of how his job duties were similar to those of other purported class members). At the conditional certification stage, the court must consider all of the evidence and declarations before it determines whether plaintiffs have made a sufficient "factual showing" that they and the purported class were "similarly situated" victims of an unlawful common policy or plan. *See Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261-62 (S.D.N.Y. 1997); *Lysyj v. Milner Distribution Alliance, Inc.*, No. 13-cv-01930-RM-MJW, 2014 WL 273214, *2 (D. Colo. Jan. 24, 2014); *Bond v. Nat'l City Bank of Pennsylvania*, 2006 WL 1744474, at *4 (W.D. Pa. June 22, 2006) (affirming denial of motion for conditional class certification where plaintiffs had not shown that they were together victims of an unlawful policy). "Despite the lenient standard at this stage, mere conclusory declarations or those based on hearsay or speculation are insufficient to grant conditional FLSA collective action certification." *Beall v. SST Energy Corp.*, 2016 WL 286295, at *1 (D. Colo. Jan. 25, 2016); *see also Haynes v. Singer Co.*, 696 F.2d 884, 887 (11th Cir. 1983) (affirming district court's denial of notice where judge had before him only "unsupported assertions" that FLSA violations were widespread and that

additional plaintiffs would come from other stores"); *Bernard v. Household Int'l, Inc.*, 231 F. Supp. 2d 433, 435 (E.D. Va. 2002) ("Mere allegations will not suffice; some factual evidence is necessary."); *H&R Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999) (denying certification where plaintiffs relied on "unsupported assertions" and "affidavits making conclusory allegations"); *Barfield v. N.Y. City Health & Hosps. Corp.*, No. Civ. 05-6319, 2005 WL 3098730, at *1 (S.D.N.Y. Nov. 18, 2005) (denying motion for collective certification of hospital nurses and holding that "anecdotal hearsay" was insufficient to establish purported company-wide unlawful policy or plan).

Here, Plaintiff baldly asserts that all Helix site supervisors were unlawfully compensated, offering nothing but unsupported, general, conclusory statements regarding how the proposed class is similarly situated.  [Dkt. 96 at p. 14].

But Plaintiff's own declaration and allegations—along with Robert Meadows' contrary declaration—confirm that the purported class is not similarly situated.  Kenney declares that "[i]n February 2017, Helix began paying me an <u>hourly</u>[1] rate (for the same work); Helix paid me the hourly rate for all the hours that I worked, including for those hours over 40 hours in a single workweek (or, "straight time for overtime")."  [Ex. B to Dkt. 29 at ¶ 4].  Despite working with Helix from April 2016 to August 2017, Meadows' declaration contains no such statement.  [*See* Ex. C to Dkt. 29].  Instead, Meadows states that "Helix paid me a <u>salary</u> with no overtime compensation."  [*Id.* at ¶ 3].  Further, in the Collective Action Complaint, Kenney inconsistently alleged "Kenney and the Putative Class Members all received a <u>salary</u>."  [Dkt. 1 at ¶ 14].  If they are in fact "victims," Kenney and Meadows are victims of different policies or plans.  In light of Kenney's and Meadows' unique circumstances (as reflected in their declarations), a determination

---

[1] If this was indeed a "typographical error" as Kenney suggested years ago [Dkt. 56 at Fn. 1], Kenney had three years to rectify the supposed mistake, but did not do so.

of whether Helix violated FLSA requirements can only be determined through an individualized inquiry of employees.

Further, Plaintiff does not make a single sufficient allegation, much less provide a declaration from any employee, other than Meadows, to support his claim that the purported class is the victim of a common policy or plan. Indeed, Kenney's allegations are general, vague, and founded upon inadmissible hearsay and speculation. For example, Kenney alleges, "[b]ased on my . . . conversations with co-workers, I know that Helix paid all its full-time Security Guards a salary with no overtime compensation[.]" [Ex. B to Dkt. 29 at ¶ 4]. Despite having at least eight additional site supervisors that have opted into this action, Kenney does not provide any specificity. He does not identify who he allegedly spoke to and when he allegedly had such conversations, much less provide a declaration or any substantive evidence from the source. Such hearsay statements to support conditional certification have previously been rejected in this District. *See Saarela v. Union Colony Protective Servs., Inc.*, 2014 WL 3408771, at *3 (D. Colo. July 14, 2014); *see also Stubbs*, 227 F.R.D. at 666 (finding that plaintiff's affidavit stating that he had spoken to coworkers who confirmed that their circumstances were similar to his were insufficient to show similarity for purposes of conditional collective action class certification).

Kenney's conclusory allegations and dearth of supportive evidence (that should be readily available to Kenney considering the eight purported class members who have opted-in to this action) do not meet the burden necessary to show the class is similarly situated. *See Beall v. SST Energy Corp.*, 2016 WL 286295 at *1 (D. Colo. Jan. 25, 2016) ("mere conclusory declarations or those based on hearsay or speculation are insufficient to grant conditional FLSA collective action certification."); *McDonald's Corp.*, 227 F.R.D. at 666 (denying conditional certification where plaintiff provided little evidence—including no names and no affidavits—of how his job duties

were similar to those of other purported class members); *Saarela*, 2014 WL 3408771 at *3. (plaintiffs must come forward with "substantial allegations" that they are victims of a common policy or plan); *Bond v. Nat'l City Bank of Pennsylvania*, 2006 WL 1744474, at *4 (W.D. Pa. June 22, 2006) (affirming denial of motion for conditional class certification where plaintiffs had not shown that they were together victims of an unlawful policy).  A determination of whether Helix violated FLSA requirements can only be determined through an individualized inquiry of employees.  The Court should deny conditional certification.

### ii. The Purported Class is Not, in Fact, Similarly Situated.

Even **if** some former Helix employees, like Kenney and Meadows, share certain similarities in their grievances, the bulk of the proposed class members are materially dissimilar, requiring an individual inquiry of each employee and precluding a class action.

### 1. Many purported class members did not suffer damages.

Plaintiff broadly defines the proposed class as "all security guards, site supervisors, and/or operators. . . who received a salary and no overtime from September 13, 2014, through the present."  [Dkt. 96 at p. 2].  This class includes a large number of employees who have not suffered any damages.

A significant part of the compensation that Helix provided to its salaried employees came in the form of stock through Helix's Employee Stock Award Program ("ESAP").  *See* Deposition transcript of Grant Whitus attached hereto as **Exhibit 1** at 36:23—37:16.  The stock options were required to vest for a period of one year, after which each employee received at least 300 shares of stock per quarter.  *See* Helix response to interrogatories attached hereto as **Exhibit 2** at p. 3.

Helix stock was offered in lieu of, and was more valuable than, overtime pay.  Ex. 1 at 36:13—37:16.  Indeed, at the beginning of the class period (September 15, 2014), Helix's shares

traded at $.04/share but quickly rose to $9.90/share (November 2016). *See* https://www.nasdaq.com/market-activity/stocks/hlix. Several purported class members confirmed that they chose to become salaried employees because of the stock options they were offered. *See ex.* Deposition transcript of Michael Rossell attached hereto as **Exhibit 3** at 13:3-13; Deposition transcript of Michael Brandon Boufford attached hereto as **Exhibit 4** at 14:2. And multiple class members have, in fact, accumulated a significant amount of stock either completely offsetting purported damages or significantly reducing it. *See ex.* ESAP list attached hereto as **Exhibit 5** (site supervisor Joseph Napoleon has 6,000 shares of stock; site supervisor Brandon Boufford has 4,750 shares of stock; site supervisor Brian Goodman has 5,250 shares of stock; site supervisor Sean Goodman has 7,250 shares of stock; site supervisor David Middlebrooks has 12,250 shares of stock); *see Dep't of Human Servs. v. State Pers. Bd.*, 2016 COA 37, ¶ 33 (in calculating a back-pay award "some collateral sources of compensation for the loss, are subtracted from the award to offset the employer's liability.") (internal citation omitted); *Kohlheim v. Glynn Cty., Ga.*, 915 F.2d 1473, 1481 (11th Cir. 1990) ("[t]he FLSA mandates that "extra" compensation paid by an employer be credited toward overtime compensation due"); *Allen v. Entergy Operations Inc.*, 163 F. Supp. 3d 324, 337 (E.D. La. 2016) (court dismissed plaintiffs that had a maximum recovery below zero holding that "failure to offset the erroneous bonuses against any overtime due would result in a windfall to Plaintiffs").

 The value of these shares exceeds the wages purportedly due to numerous proposed class members. For instance, since 2016, 68 people have received or will receive Helix shares. *See* Ex. 5. 125,750 shares have been issued. *See Id*. 53 people are scheduled to receive at least another 176,700 shares from 2018. *Id.* At $9.90 per share, which the stock has traded at, and which Helix

believes is a conservative estimate of future value considering the company's growth, the 302,450 shares Helix has given or will give to 74 class members is $2,994,255 worth of stock.[2]  *Id.*

Conversely, Plaintiff and each of the eight opt-in members along with many other employees (who did not work the year required for their stock to vest), did not receive any stock. *See* Ex. 5.  Thus, to determine actual damages, Helix must analyze each individual class member to determine how much stock they received, when they received it, the value of the stock when they received it, if they sold it the value when sold, the value of the stock in each week in which they claim unpaid overtime, and the present value of the unexercised or unvested stock options that they presently hold, and then make appropriate damage deductions for each individual, which will likely result in many class members having suffered zero damages.  Such an analysis necessarily requires an individualized inquiry and the class should not be conditionally certified.

### 2. The class does not have similar job duties and responsibilities.

Kenney paints a broad-brush generalization of the class baldly stating that they all "performed the same or similar job duties".  [Dkt. 96 at p. 13].  But the proposed class is not a monolith that can be lumped together.  Indeed, there are striking dissimilarities between proposed class members.

For instance, Kenney and Meadows state they were "Security Guard[s]" whose primary job duties included monitoring security cameras, patrolling assigned locations, investigating and documenting all facility related incidents, performing certain janitorial duties, and enforcing client, local, state, and federal policies and regulations pursuant to Helix and/or its clients' established guidelines, procedures, and protocols.  [Dkt 96 at p. 4].  Kenney and Meadows claim they "did not supervise, hire, fire, discipline, or interview current or potential workers."  *Id.* at p. 5.

---

[2] Another six people will receive 12,500 in stock after they have been employed for a year.  Ex. 5.

Likewise, opt-in class member William David Baker claims that while he was a salaried employee with Helix, he ordinarily worked alone and never had supervisory responsibilities. *See* Declaration of William David Baker attached hereto as **Exhibit 6**. He claims that he had no authority to hire or fire other Helix employees, and was not consulted about hiring and firing decisions. *Id.* He signed a contract indicating that he was a site supervisor (*see* Baker Site Supervisor Contract, attached hereto as **Exhibit 7**), but he claims that he was never actually promoted to site supervisor, and was instead an armed operator. *See* Deposition transcript of William David Baker attached hereto as **Exhibit 8** at 39:20—41:22.

Similarly, opt-in class member Jeffrey Gill claims that while he was a salaried employee with Helix, he ordinarily worked alone and never had supervisory responsibilities. *See* Declaration of Jeffrey Gill attached hereto as **Exhibit 9**. He claims that he had no authority to hire or fire other Helix employees, and was not consulted about hiring and firing decisions. *Id.* Gill claims that he was never a site supervisor, only an "operator." *See* Deposition transcript of Jeffrey Gill attached hereto as **Exhibit 10** at 19:13—20:13.

Conversely, eight proposed class members whom Plaintiff seeks to represent in this action have testified under oath that they had different duties and responsibilities than Kenney, Meadows, Baker, and Gill. These deponents acknowledged that they were supervisors and that they were responsible for, among other things, training guards, making or recommending employment decisions, supervising at least one guard while on site, supervising other guards during the week while off site, reproaching and correcting guards who exhibited poor performance, addressing guard's complaints or concerns, recommending transfers of guards, scheduling shifts for guards, serving as Helix's point person for communication with its clients, and ensuring that guards complied with applicable laws and regulations.

For instance, Davis Vang started with Helix as a salaried security guard and was soon promoted to site supervisor.  *See* Deposition transcript of Davis Vang attached hereto as **Exhibit 11** at 13:2—14:2.  As a site supervisor, Vang was in charge when he was on post.  *Id.* at 19:3-8. There was always one other person working with him.  *Id.* at 38:11-13.  As a site supervisor, Vang would "teach" and train the site's guards, whom he supervised.  *Id.* at 14:20—15:25.  If Vang had a concern with a guard he was supervising, he would remonstrate that guard directly; if that guard continued to display poor performance, Vang would report his concerns to upper-level management.  *Id.* at 16:16—17:12.  At the end of the week, Vang was responsible for reviewing the activity logs of all guards.  *Id.* at 25:13—26:7.  He discussed operational standards with the owners of a site, and then trained his supervisees on those standards.  *Id.* at 17:13—18:4.  Further, Vang, as a site supervisor, trained guards on the laws and policies that govern cannabis.  *Id.* at 18:5—19:2.  Vang also was the point person for concerns or complaints by Helix guards.  *Id.* at 20:3-15.  He had the authority to instruct a guard to remove a customer from a site.  *Id.* at 43:2-4. Vang testified that managing Helix employees is the most essential job function of a site supervisor.  *Id.* at 22:7-14.   He also testified that as a site supervisor he had access to Helix's confidential and proprietary information and procedures and trained his guards on them same.  *Id.* at 23:2-23.  As part of his duties, Vang was the point person for whoever was managing the store on the customer side and was responsible for addressing their problems and concerns.  *Id.* at 26:4-15.  He monitored other guards via camera.  *Id.* at 34:12-17.

Brian Goodman was a site supervisor.  *See* Deposition transcript of Brian Goodman attached hereto as **Exhibit 12** at 8:22-23.  As a site supervisor, Goodman always worked with at least one other Helix employee.  *Id.* at 10:6-10.  He supervised guards with less experience than him.  *Id.* at 10:11-25.  As part of his supervisory duties, he trained guards on policies and

procedures. *Id.* at 11:4—12:11. If Goodman saw a guard doing something wrong, he would speak to, and counsel, that guard. *Id.* at 12:12-20. If things did not get better, he would fill out reports. *Id.* at 12:20—13:3. Goodman instructed guards on how to perform tasks. *Id.* at 13:4—14:7. Guards would come to Brian Goodman with concerns, and he would resolve concerns that arose from, for example, scheduling conflicts. *Id.* at 14:8—15:17. Even on his off days, or when he was not on site, guards reached out to Goodman for help and he gave them instructions. *Id.* at 21:25—22:12. Goodman determined the schedule for patrols and rotations. *Id.* 15:24—16:15. And he was the point person for the manager or owner of the site who relayed any concerns to Goodman. *Id.* at 16:16-22. After hearing concerns from clients, Goodman determined how to resolve the situation and instructed Helix employees on what to do. *Id.* at 16:23—17:8. Moreover, if a Helix employee was not familiar with marijuana law, Brian Goodman would train that employee on the law. *Id.* at 17:17—18:6. Indeed, as a site supervisor, Goodman trained 10-15 employees over two or three months. *Id.* at 18:7-12. If those guards did not perform well in training, Goodman could recommend that they not be hired. *Id.* at 18:13-18. He could also recommend that a guard be removed from a site. *Id.* at 36:2-7. Goodman believes that an essential job function of a site supervisor is to manage Helix employees. *Id.* at 19:18-2. He describes site supervisor duties as overseeing the site, handling training and compliance, and providing coaching throughout the day. *Id.* at 26:12-20; 31:9-18. Further, as a site supervisor, Brian Goodman had access to confidential and proprietary information that he trained Helix employees on. *Id.* at 20:14—21:8.

Sean Goodman, Brian Goodman's brother, was also a site supervisor on weekdays (on weekends he was a weekend supervisor). *See* Deposition transcript of Sean Goodman attached hereto as **Exhibit 13** at 21:2-13; 29:9-14. As a site supervisor, Sean Goodman often worked with other Helix employees on site. *Id.* at 32:11—33:17. He explained that the essential job function

14

of a site supervisor is to manage Helix employees. *Id.* at 21:14-19. Indeed, as a site supervisor, he would oversee opening and closing procedures, and answer questions from other guards. *Id.* at 33:18—34:23; 50:8-12. He also decided when to make rotations. *Id.* at 50:16—51:21. If guards had questions, Sean Goodman would provide instructions on what to do. *Id.* at 50:2-15. He also had access to Helix's proprietary and confidential information. *Id.* at 22:6-9. If the client had any questions, Goodman was the point of contact and would work to address client issues, which could take up significant time. *Id.* at 35:17—36:19; 39:4-5. Further, he was authorized to write up Helix employees for infractions, and those write ups were relied upon in making employment decisions. *Id.* at 45:25—46:7; 51:22—53:20. After he was site supervisor, Sean Goodman became Helix's manager of operations; he testified that in that capacity, he gives site supervisor write-ups significant weight. *Id.* at 52:17—53:20.

Iain Gilfillan testified that, as a site supervisor, he could make recommendations about hiring or firing decisions. *See* Deposition transcript of Iain Gilfillan attached hereto as **Exhibit 14** at 17:19-25. Gilfillan supervised the guards with whom he worked. *Id.* at 20:9-14. Gilfillan's supervisory responsibilities included training guards, setting expectations, and answering questions about work procedures. *Id.* at 20:15-22. Gilfillan would observe other guards on site and would give them feedback on their performance and "correct discrepancies." *Id.* at 20:23—21:4. Moreover, as a site supervisor, Gilfillan was Helix's primary representative to the client. *Id.* at 21:5-15.

Mike Rossell testified that he started with Helix as a salaried security operator. Ex. 3 at 10:1-7. He testified that a security operator is not a site supervisor and that the difference is that security operators move from site to site like "roamers" and a site supervisor is the one who was at a site permanently. *Id.* at 10:21—11:17. Eventually, Rossell was promoted to site supervisor.

*Id.* at 14:12-14.  As site supervisor, Rossell trained employees on the post orders and site policies, reviewed the site with them, and generally watched over them and made sure they were doing their jobs.  *Id.* at 18:2—19:5; 33:4-11.  He always worked with at least one other employee.  *Id.* at 19:9-12.  Rossell monitored the employees that he supervised via camera.  *Id.* at 20:12-21.  He was the point of contact for the client.  *Id.* at 22:10-24.  If Rossell was off-site, and a Helix employee ran into a problem on site, they called Rossell for advice and instruction.  *Id.* at 22:25—23:14.  Rossell educated employees on marijuana law.  *Id.* at 24:15-18.  He testified that an essential job function of a site supervisor is to manage Helix employees.  *Id.* at 26:15—27:4.  Indeed, he had an operator that "just couldn't get it" and he spent "day after day" working with the guy.  *Id.* at 27:1-4.  And if any employee "couldn't get it," Rossell could request that they be transferred.  *Id.* at 27:5-24; 29:3-21.  Rossell corrected employees if they were doing something wrong.  *Id.* at 34:1-5.  Even though he supervised one guard at a time while on site, Rossell supervised multiple guards while off site.  *Id.* at 29:22—30:19.  As such, he would review security operators' logs at the end of each day, regardless of whether he was on site.  *Id.* at 30:20—31:13.

Joseph Napoleon was a Helix site supervisor.  *See* Deposition transcript of Joseph Napoleon attached hereto as **Exhibit 15** at 5:7-8.  He testified that, as a site supervisor, he had input on, among other things, how a site should be secured.  *Id.* at 16:13-25.  For instance, Napoleon could recommend that employees perform a security task for a client a certain way.  *Id.* at 17:3-12.  As a site supervisor, Napoleon worked with other guards and would train new guards on site by, among other things, teaching them the "ins and outs of the sites," teaching them when it was best to perform rounds, and training them how to follow "post orders."  *Id*. at 23:1—25:2.  He would also train guards on marijuana compliance (*Id.* at 32:2-8) and would, at times, go in on his off days to train guards.  *Id.* at 23:3-6.  Moreover, guards would come to Napoleon with

concerns.  *Id.* at 33:7-11.  As a point person for the client, if a guard was performing poorly, the client would contact Napoleon, who would, in turn, raise concerns about the guard to upper-level management.  *Id.* at 25:3-17.  Napoleon could also recommend that a guard be transferred to a different site.  *Id.* at 26:2-6.  Napoleon believes that supervising Helix site employees is an essential job function of a site supervisor.  *Id.* at 36:5-8.

David Middlebrooks was a site supervisor.  *See* Deposition transcript of David Middlebrooks attached hereto as **Exhibit 16** at 7:22-24.  He often worked with another Helix employee.  *Id.* at 9:21-25.  As a site supervisor, Middlebrooks would walk new guards around and explain their duties to them.  *Id.* at 10:14-22.

Finally, Brandon Boufford was an "armed guard" when he became a salaried employee with Helix.  Ex. 4 at 10:2.  Within several months, Boufford was promoted from salaried armed guard to site supervisor.  *Id.* at 14:20—15:1.  As a site supervisor, Boufford worked with Helix guards.  *Id.* at 16:25—17:3.  He would provide advice and answer questions for those guards.  *Id.* at 17:21—18:13.  For instance, Boufford would instruct guards on the best way to perform patrols.  *Id.* at 18:14-25.  As a site supervisor, Boufford had discretion to switch and modify employee shifts.  *Id.* at 20:3-25.  Boufford also trained between 6-12 people on, for example, camera operation, patrol, the security system, and properly labelling containers.  *Id.* at 21:4-23.  He corrected guards who committed infractions.  *Id.* at 31:24—32:2.  As a site supervisor, Boufford explained that he was the point person for the GM or manager of the store.  *Id.* at 22:25—24:5.  When off site, Boufford would receive calls from guards seeking advice and instruction and, if needed, Boufford would go to the site to assist.  *Id.* at 24:6—25:1; 26:5-9.  Even when Boufford worked alone, he frequently received calls from guards at other locations asking him questions.  *Id.* at 36:5-11.  He believes that managing Helix site employees was an essential job function of

17

being a site supervisor.  *Id.* at 28:11-13.  Boufford had access to proprietary or confidential Helix policies. *Id.* at 29:13-17.  Further, Boufford could inform upper management if a guard was not a fit for a particular location.  *Id.* at 31:6-9.

There are striking material differences between Kenney, Meadows, Baker, and Gill on the one hand, and proposed class members Vang, Brian and Sean Goodman, Gilfillan, Rossell, Napoleon, Middlebrooks, and Boufford on the other hand.  Blanket class-wide assumptions cannot be made.  Instead, a factfinder must examine each class member individually to determine, among other things, their supervisory responsibilities, hours spent on supervisory duties, ability to recommend whether employees may be hired or fired, and number of employees they supervised. Conditional certification should be denied.

### 3. Dissimilarities between employment contracts.

Many of the class members, including class deponents Sean Goodman, Davis Vang, and Mike Rossell, signed site supervisor contracts acknowledging that they are exempt employees, not entitled to overtime.  *See ex.* Executed Helix Employment Agreement at Will Contracts, attached hereto as **Exhibit 17** at p. 2.   The Employment Agreement at Will states "[e]mployee understands that at all times they is (sic) employed as a salaried/exempt employee and, therefore, he/she is not entitled to overtime wages.  *Id.*  Employee shall not receive overtime compensation for the services performed under this Agreement, unless specifically agreed to in writing."  *Id.*

Opt-in plaintiff Russell Hansen signed the Employment Agreement at Will.  Ex. 17 at HELIXTCS00003276-00003282.  It is unknown what, if any, contract opt-in plaintiff Gill signed. *See* Ex. 10 at 31:9-21.  Opt-in plaintiff Baker, like some other members of the class, signed a wholly different contract from the Employment Agreement at Will.  *See* Ex. 7.  Kenney and the

other opt-in plaintiffs, Reinaldo Nunez, Jr., Robert Meadows, Dustin Wolf, Sr., Roman Rios, and Shannon Aden do not appear to have signed any agreements.  Ex. 17.

The class is not similarly situated with respect to employment contracts.  Helix will need to make an individualized inquiry of every class member to determine, among other things, if they signed a contract, whether they understood the contract, what they were told orally about the contract, what they understood were the implications of the contract, and why they signed the contract.  Conditional certification should be denied.

### 4. Many purported class members viewed the site supervisor program favorably.

Kenney and the other opt-in plaintiffs are uniquely disgruntled employees whose feelings of aggrievement are dissimilar to the overall class.  Unlike Kenney and the opt-in plaintiffs, eight other potential class members indicated that they were treated fairly by Helix.  *See ex.* Ex. 14 at 14:10-18; Ex. 15 at 41:21—42:8; Ex. 4 at 32:20—33:3; Ex. 12 at 22:17-18; Ex. 13 at 26:1; Ex. 3 at 34:16—35:20; Ex. 11 at 26:18-22; Ex. 16 at 13:12—14:2.

Furthermore, after this litigation began, Helix intended to terminate the site supervisor program to minimize its potential damages.  *See* Email Terminating Site Supervisor Program, attached hereto as **Exhibit 18**; Ex. 1 at 35:19—36:12.  But, after strong opposition from those in the program—who did not want to lose their stock option benefits—Helix decided to reinstate the site supervisor program only days later.  *See* **Exhibit 19**.

Plaintiff has no basis for baldly asserting that anyone who was not paid overtime was damaged—because that is clearly not the case.  This litigation requires an individualized inquiry of all proposed class members to determine if, in fact, they believe they were damaged by Helix.  Conditional certification should be denied.

### 5. Many purported class members received overtime pay.

Kenney seeks to conditionally certify a class of salaried site supervisors, security guards, and operators who received **<u>no</u>** overtime compensation from September 13, 2014 through the present.  [Dkt. 96 at p. 2].  However, many of these salaried employees—including Kenney and four other opt-in plaintiffs—**<u>did</u>** receive overtime compensation during this time period and, therefore, could not be part of their own class.

Plaintiff, who claims he never received overtime payments, did, in fact, receive overtime payments.  *See* **Exhibit 20** at pp. 2-3.  Likewise, opt-in plaintiffs Meadows, Aden, Baker, and Gill also received overtime payments.  *Id.* at pp. 1, 4-10.  Those five, therefore, do not fit into their own class definition, cannot be part of their own class, and necessarily cannot be similarly situated to those purported class members who did not receive overtime.

Again, an individualized inquiry is required to determine who received overtime pay, when, and under what circumstances.  Conditional certification should be denied.

### 6. Dissimilarity of job titles

Plaintiff seeks to neatly categorize the class into "security guards, site supervisors, and/or operators".  [Dkt. 96 at p. 2].  However, Kenney and the opt-in plaintiffs cannot easily be categorized into holding any of those positions.  *See* Ex. 8 at 39:20—41:22 (opt-in plaintiff Baker signed a contract indicating that he was a site supervisor, but he claims that he was never a site supervisor).

Moreover, Kenney's job title—"security guard"—and the titles in the class definition are not similarly situated with the class.  Indeed, there is no uniform application of job titles that would make a collective action appropriate.  *See ex.* Ex. 3 at 25:2—26:14 (Rossell had signed site supervisor agreement but testified that he was initially employed as "security operator"); Ex. 13 at 20:21—22:13 (Sean Goodman had signed site supervisor agreement but testifies he was hired as

a "guard"); Ex. 11 at 13:4 (Vang testified that he started as a "guard" with Helix, even though he

had signed the site supervisor Employment Agreement at Will Contract (*see* Vang Employment

Contract, attached hereto as **Exhibit 21**)); Ex. 14 at 10:15; 15:7-8 (Gilfillan testified that he is

currently both "weekday supervisor" and "site supervisor"); Ex. 4 at 14:9—15:1 (Boufford

testified he was an "armed guard" when he became salaried, then promoted to "site supervisor");

Ex. 12 at 8:10-23 (Brian Goodman started as a salaried "security guard" then became a "site

supervisor" several months later).  Many of the class deponents' job titles—such as "armed guard,"

"guard," "security operator" and "salaried operator"—are not even mentioned in Plaintiff's class

definition.

With respect to job titles, the purported class is not remotely similar.  An individualized

inquiry of everyone is required and conditional certification should be denied.

**C.**     **If The Class is Conditionally Certified, the Class Period Should be From September 13, 2014 Through September 17, 2018.**

With respect to the class period, the Court held that "the statute of limitations for all

potential opt-in plaintiffs is tolled from September 13, 2017, until this Court rules on Plaintiff's

Motion for Conditional Certification, or until the Court otherwise orders."  [Dkt. 55].  The Court

denied the Motion for Conditional Certification on September 17, 2018.  [Dkt. 69].  Thus, the

tolling period expired on September 17, 2018.  By the express terms of the Court's order, if

conditional certification is granted, the class period should be from September 13, 2014, through

September 17, 2018.[3]

---

[3] Of course, if there is no finding of willfulness, the class period will be from September 13, 2015, through September 17, 2018.  *Coldwell v. RiteCorp Envtl. Prop. Sols.*, 16-CV-01998-NYW, 2017 WL 4856861, at *8 (D. Colo. July 20, 2017) ("The employee must. . .commence the action within two years of accrual, or within three years if the cause of action arises out of a willful violation, or the cause of action is barred").

**D.      The Proposed Notice is Improper.**

In the event the Court conditionally certifies the class, Helix requests the Court deny Plaintiff's proposed notice.  Pursuant to the FLSA, "the court has the power and the duty to ensure that the notice is fair and accurate[.]"  *Smith v. Pizza Hut, Inc.*, 2012 WL 1414325, at *7 (D. Colo. Apr. 21, 2012).  "In exercising the discretionary authority to oversee the notice-giving process, courts must be scrupulous to respect judicial neutrality." *Hoffman-La Roche Inc., v. Sperling*, 493 U.S. 165, 174 (1989).

Plaintiff's proposed notice is biased and slanted toward Plaintiff's position in several respects.  For example, it states, "A collective action lawsuit alleges Helix violated . . . the . . . FLSA.  The FLSA requires employers to pay overtime . . . unless the employees are exempt." [Ex. 13 to Dkt. 96 at § 1].  This language is biased towards Plaintiff by implying that Helix violated federal law and not defining "exempt."

Additionally, the notice states, should the Plaintiffs prevail in this lawsuit, you may recover damages for overtime worked[.]"  [*Id.* at § 2].  However, the notice fails to warn potential claimants that they may be liable for costs and fees if Helix prevails.  *See Reyes v. Bona 1372, Inc.*, 2017 WL 5148367, at *10 (E.D. Tex. Oct. 17, 2017) (Court ordered the parties to meet and confer regarding the notice where the notice was misleading and biased and did not warn about potential claimants' possible liabilities if the lawsuit was unsuccessful).  Further, Kenney requested a trial by jury, so the statement that the Court will determine "who will win this case" is inaccurate.  [Ex. 13 to Dkt. 96 at § 2].

In paragraph 4, the proposed notice states, "if you return a Consent to Join Wage Claim form, you will join the other individuals who have already joined this case."  [*Id.* at § 4].  This is misleading given that some opt-in employees may later be determined to be ineligible. *See Boykin*

*v. Anadarko Petroleum Corp.*, 2018 WL 1406878, at *3 (D. Colo. Mar. 21, 2018) ("The Court finds other portions of the proposed notice and consent forms to be misleading—*e.g.* paragraph 4 of the proposed notice promises that 'If you return a Consent...form, you will be a part of this case,' when, in fact, some employees who opt-in might later be determined to be ineligible for various reasons").

In paragraph 5, the proposed notice outlines the "effect of joining or not joining the lawsuit." [Ex. 13 to Dkt. 96 at § 5]. This paragraph is objectionable because it appears the language is coming from the Court which places undue pressure on the recipient to join the lawsuit.

Paragraph 6 is objectionable because it strongly—and falsely—suggests that Helix will retaliate against any employee who joins the lawsuit. [Ex. 13 to Dkt. 96 at § 6]. Furthermore, while Helix, of course, will abide by all applicable laws, the language that Helix "has agreed to abide by the law in this regard" [*Id.*] implies that Plaintiff and Helix conferred and agreed on all language in this notice, which is not true.

In paragraph 7, the notice instructs the recipient to "**not** contact Helix or Helix's attorneys about the lawsuit." [Ex. 13 to Dkt. 96 at § 7]. This language is objectionable. Any notice recipient, if they so choose, may discuss this litigation with whomever they want. This is a transparent attempt by Plaintiff to dissuade class members from cooperating with Defendants' investigation. Furthermore, the language that any information a letter recipient provides to Helix "may be used against you" [*Id.*] is also prejudicial and objectionable given that it implies that Helix intends to use witness interviews to harm the interviewee.

The Consent to Join the Wage Claim is objectionable. [Ex. 13 to Dkt. 96 at p. 13]. The consent includes a consent to have "Kenney and his counsel make all decisions regarding the litigation" including terms of settlement and releasing claims. [*Id.*]. This infringes on the rights

of an opt-in party to "assert, compromise, or proceed to trial on their own claims if they so choose." *Boykin*, 2018 WL 1406878, at *3 ("the proposed consent form, which requires all opt-in plaintiffs to allow Mr. Boykin and his counsel to 'make all decisions regarding the litigation' on their behalf also abridges their right to assert, compromise, or proceed to trial on their own claims if they so choose").  Moreover, a party cannot designate another party and their lawyers to have authority to settle litigation and release claims.  *See Jones v. Feiger, Collison & Killmer*, 903 P.2d 27 (Colo. App. 1994), reversed on other grounds, 926 P.2d 1244 (Colo. 1996) ("Any provision in an agreement to provide legal services that would deprive a client of the right to control settlement is unenforceable as against public policy"); *Nichols v. Orr,* 63 Colo. 333, 335, 166 P. 561, 561 (1917) ("[A]ny agreement which deprives the litigant of the right to control his case, before it is finally determined, is void as against public policy.").

 Helix objects to the proposed notice and consent and seeks leave, in the event of conditional certification, for the parties to confer and attempt to agree on a mutually agreeable notice.  Barring agreement by the parties, the Court could determine an appropriate notice and consent based on the parties' respective submissions.

**E.      The Proposed Notice Dissemination Method is Improper.**

 If the Court conditionally certifies the class, Helix requests the Court deny Plaintiff's proposed notice dissemination method.  Kenney seeks to barrage potential class members first with a notice sent "via mail, email, **and** text," then with identical reminders notices sent via mail, email, and text "half-way through the 60-day opt-in period," and finally with "follow-up" calls if any notice is "returned as undeliverable."  [Dkt. 96 at p. 14].  This intrusive pestering has routinely been rejected in this District.

Kenney should only be authorized to send the notice via mail.  If that is returned as undeliverable, then Kenney should be allowed to contact any putative class member by phone. This reasonable approach has been supported in this District and should be adopted here.  *See ex. Robertson v. Whitman Consulting Org., Inc.*, 2020 WL 5097597, at *5 (D. Colo. July 22, 2020) ("the Court finds it reasonable to contact putative class members by telephone **only in** instances when the mailed Notice is returned as undeliverable [and] recommends allowing Plaintiff's counsel to contact putative class members by telephone under these very limited circumstances") (emphasis added); *Bryant v. Act Fast Delivery of Colorado, Inc.*, 2015 WL 3929663, at *5 (D. Colo. June 25, 2015) ("The Plaintiffs may disseminate the Notice and Consent Forms **once** to each potential opt-in plaintiff via mail **or** e-mail) (emphasis added); *Boykin*, 2018 WL 1406878, at *4 (declining a request to make any telephone calls and send reminder emails); *Murphy v. Allstaff Med. Res., Inc.*, 2017 WL 6945036, at *3 (D. Colo. June 13, 2017) (declining to authorize notification by text message); *Ward v. Express Messenger Sys., Inc.*, 2018 WL 1604622, at *8 (D. Colo. Apr. 3, 2018) ("the court finds that the use of First Class Mail, email, and text message is excessive").

The Court should, therefore, reject Kenney's proposal to twice contact class members by mail, text, and email followed by a follow-up call if any mail is undeliverable.  Instead, the Court should authorize the notice to initially be sent only by mail and, only if the mail is returned as undeliverable, may Kenney contact class members by phone.

WHEREFORE, Defendant Helix TCS, Inc. respectfully requests that this Court DENY the Certification Motion.

Dated this 25th day of January, 2021.

Respectfully submitted

ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.

*/s/ Jeremy T. Jonsen*
Jordan Factor
Jeremy T. Jonsen
1600 Stout Street, Suite 1900
Denver, CO 80203
(303) 534-4499
jfactor@allen-vellone.com
jjonsen@allen-vellone.com

**Attorneys for Helix TCS, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of January, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Michael A. Josephson
Lindsay R. Itkin
Andrew W. Dunlap
Josephson Dunlap
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
*Attorneys for Plaintiff*

*s/ Lisa A. Vos*
Lisa A. Vos